UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:                                              CASE NO. 17-11015

FLYGLO, LLC                                CHAPTER 11

*Debtor*                                        SECTION "B"

**DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS (1) AUTHORIZING AND APPROVING DEBTOR'S POST-PETITION FINANCING; (2) GRANTING SECURITY INTERESTS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; AND (3) MODIFYING AUTOMATIC STAY PURSUANT TO 11 U.S.C. §§ 105, 362, 363 AND 364 AND FEDERAL
RULES OF BANKRUPTCY PROCEDURE 2002 AND 4001**

**NOW INTO COURT**, comes FlyGlo LLC as a debtor and debtor-in-possession (the "Debtor"), through its undersigned counsel, and files this *Motion for Interim and Final Orders (1) Authorizing and Approving Debtor's Post-Petition Financing; (2) Granting Security Interests and Providing Superpriority Administrative Expense Status; and (3) Modifying Automatic Stay Pursuant to 11 U.S.C. §§ 105, 362, 363 and 364 and Federal Rules of Bankruptcy Procedure 2002 and 4001*.

**SUMMARY**

1.      In this Motion, the Debtor requests authority to enter into debtor in possession financing (the "DIP Loan") for purposes of making adequate protection payments, paying ongoing operating expenses and other administrative expenses. The proposed debtor-in-possession financing lender is an insider Wyoming Aviation ( majority owner of 100% owner of the Debtor)**.** The proposed terms for such financing are set forth in the term sheet ("Term Sheet") incorporated in this Motion..

{00357523-2}                                                                                                                     1

## LEGAL STANDARD

2. Post-petition debtor-in-possession financing is governed by Section 364 of the Bankruptcy Code. Courts may approve post-petition financing on a secured, super-priority administrative basis under Section 364(c) of the Bankruptcy Code, and commonly do so when the financing is necessary for the reorganization of the debtor.

3. In addition to Section 364, to the extent necessary, this Motion is made under Sections 105, 362, and 363 of the Bankruptcy Code and under Bankruptcy Rules 2002 and 4001.

## JURISDICTION AND VENUE

4. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The Debtor confirms its consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

5. Venue of this case and this Motion is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTUAL BACKGROUND

6. Debtor is a limited liability company organized in the State of Delaware with its principal place of business in New Orleans, Louisiana.

7. Debtor is an indirect air carrier based in New Orleans, Louisiana that provides passenger air transportation to various cities including New Orleans, Shreveport, Huntsville, Little Rock, Memphis and Fort Walton Beach. An indirect air carrier is an entity that is not in possession of a Federal Aviation Administration ("FAA") air carrier certificate that undertakes to

transport people or goods in air transportation through the services of a passenger air carrier. Debtor is in the process of obtaining an air carrier operating certificate.

8. Debtor leases a fleet of 3, thirty (30) passenger, SAAB 340B aircrafts from Alandia Air to service its passengers. In 2016, the Debtor moved over 32,313 passengers through New Orleans and is on track to move approximately 40,000 passengers in 2017 through New Orleans. The Debtor is essential to bringing visitors and business people in and out of New Orleans and the Gulf South. The shutdown of the Debtor would be detrimental to the growth of the economy of the Greater New Orleans region.

9. Debtor began flying in 2015. Since it commenced flying, its revenue has grown significantly.

10. Debtor's business has a significant economic impact on the economy in the markets it services. It both directly and indirectly supports seventy-nine (79) jobs and has a payroll in excess of $2.8 Million.

11. Debtor operates its business through a number of service contracts, including contracts with Air Carrier Management Company, LLC ("ACMC") and Corporate Flight Management, Inc. ("CFM"). CFM possesses the requisite certificated authority from the FAA to operate flights on behalf of Debtor. ACMC and CFM are affiliated entities. The two executory contracts that are essential to the Debtor continuing to operate and move passengers and freight are the Aircraft Management Services and Charter Agreement and the Aircraft Sublease Maintenance Agreement with CFM ("Contracts").

12. CFM has sent a notice of default to the Debtor wrongfully asserting that the Debtor defaulted under the terms of the Contracts between the parties, that the Contracts were

terminated as of the date of the notice, and that it no longer needs to perform the services it contracted to perform under the Contracts.

13. In addition to notifying the Debtor, CFM sent notice of the termination of the Contracts to the Department of Transportation ("DOT") and, as a result, under applicable DOT rules, the Debtor is currently prohibited from taking reservations and operating past April 27, 2017. In addition, the Debtor must notify its passengers on a rolling basis that it will cease flying after April 27, 2017 and cancel flights.

14. Unless a Court determines the Contracts were validly terminated pre-petition, the Contracts constitute a valuable asset of the Debtor's estate and enforcement of the terms of the Contracts against CFM is the only means of maintaining the Debtor as a going concern. The Debtor's request in this Motion is consistent with the Bankruptcy Code and Rules and the Debtor will provide "adequate protection" to CFM such that CFM will suffer no loss or risk as a result of providing services under the terms of the Contracts between the parties.

15. Wyoming Aviation even given the state of affairs of the Debtor is willing to make the DIP Loan to the Debtor in the amount of $750,000.00 of which $250,000 is needed immediately and an additional $250,000 is needed next week to make adequate protection payments and fund the Debtor's operations. The terms are a five percent (5%) interest rate during the pendency of the chapter 11 case with the DIP Loan maturing on the Effective Date of a Plan of Reorganization. The lien requested is a first lien on the Debtor's assets to the extent that such assets are free and clear of liens and lien inferior to existing valid and perfected liens on the Debtor's assets and a superpriority lien under the Bankruptcy Code.

## NEED FOR DEBTOR-IN-POSSESSION FINANCING

16. Pursuant to Section 364(c) of the Bankruptcy Code, the Debtor requests that the Court authorize the secured, administrative superpriority DIP Loan. The Debtor has determined that it is unable to obtain credit in another manner, or on any terms superior to those in the DIP Loan. The Debtor submits that entering into the DIP Loan is necessary to fund its post-petition operating expenses and allow the Debtor to successfully reorganize.

17. The proceeds of the DIP Loan would be used, in part to make the adequate protection payments proposed by the Debtor and fund the Debtors operations and bankruptcy costs. The DIP loan will preserve the value of estate assets and limit claims against the estate.

## TERMS OF PROPOSED DIP LOAN

18. The proposed restructuring is outlined in the Term Sheet, attached to this Motion. The material terms are as follows:

| | |
|---|---|
| DIP Collateral: | See above |
| Amount of DIP Loan and Use of Proceeds: | Debtor-in-possession loan ("DIP Loan") in the total maximum amount of $750,000.00, making adequate protection payments, payment of operating expenses and other administrative costs. |
| DIP Obligations: | DIP obligations (the "DIP Obligations") to be repaid under the DIP Loan include: all unpaid principal and interest on the DIP Loan. |
| DIP Loan Interest and Fees: | Interest rate of 5%, with default interest (additional 2%) upon the occurrence of an Event of Default (defined below). Borrower agrees to pay all actual and reasonable out-of-pocket fees and expenses incurred by DIP Lender in connection with the DIP Loan on the Effective Date of a Plan of Reorganization, including, but not limited to attorneys' fees. |
| Closing or Commitment Fees: | None |

| | |
|---|---|
| <u>DIP Loan Termination Date:</u> | The earliest to occur of the following (such date being the "<u>Termination Date</u>"):<br><br>(1) September 1, 2017 (the "<u>Maturity Date</u>");<br>(2) acceleration of the DIP Obligations under the DIP Loan due to the occurrence and continuation of an Event of Default;<br>(3) the "effective date" of any plan of reorganization with respect to the Borrower confirmed by the Bankruptcy Court; or<br>(4) the date of execution by the Borrower of any agreement (including any letter of intent) for the sale to any third party of all or any material portion of the property or assets of the Borrower.<br><br>On the Termination Date, the commitment of the DIP Lender to make the DIP Loan as set forth in the DIP Loan Agreement (the "<u>Commitment</u>") shall be terminated, and the DIP Lender shall have no further obligation to provide financing, pursuant to the DIP Loan or otherwise. |
| <u>DIP Loan Payments:</u> | All unpaid principal and interest on the DIP Loan, as well as all other obligations of every nature of Borrower owed to the DIP Lender under the DIP Loan Agreement (the "<u>DIP Obligations</u>"), shall be due and payable, in full on the Termination Date.<br><br>Borrower may voluntarily prepay the DIP Loan in whole or in part at any time without penalty.<br><br>In any event, the Borrower shall be required to permanently repay the DIP Loan (with a corresponding permanent commitment reduction), with the proceeds of sale of any assets of Borrower during the term of the DIP Loan. |

| | |
|---|---|
| Super-Priority Claim and DIP Lender Lien: | Except as agreed with respect to the Carve Out (as defined below)[1], all obligations and liabilities of the Borrower to the DIP Lender pursuant to the DIP Loan, including all accrued interest, fees, costs and expenses, shall constitute an allowed Super-priority administrative expense claim against the Borrower pursuant to Section 364(c)(1) of the Bankruptcy Code, having priority over all administrative expenses of the kind specified in or arising under any sections of the Bankruptcy Code (including, without limitation, Sections 105, 326, 328, 330, 331, 364(c)(1), 503(b), 506(c), 507, 546(c), 726, 1113 and 1114 thereof). (the "Super-Priority Claim"). <br><br> In addition, DIP Lender shall be granted a lien and security interest ("DIP Lender Lien") securing all DIP Obligations on all property of the estate (the "DIP Lender Collateral"), subject only to the Carve-Out. The DIP Lender Lien shall be deemed effective and perfected as of the date thereof, and no further notice or act will be required to effect such perfection. Borrower shall take such actions as may be required by DIP Lender to create and perfect such liens and security interests in the Property. The DIP Lender Lien shall be a first lien on all unencumbered assets of the Debtor and on assets subject to a valid and perfected lien shall be inferior to such liens. |
| Documentation: | The Debtor and DIP Lender may execute definitive documentation including a DIP Loan Agreement ("DIP Loan Agreement"). |
| Conditions Precedent to Closing: | The closing of the DIP Loan, and the initial funding thereunder, shall be subject to conditions precedent customary and appropriate for financings of this type, including but not limited to: <br><br> (1) receipt by the DIP Lender to the extent requested of a duly executed DIP Loan Agreement and any necessary ancillary loan and security documents, in form and substance satisfactory to the DIP Lender; and <br> (2) entry by the Bankruptcy Court an interim and final order ("Final Order") which shall approve the DIP Loan and DIP Loan Agreement, and which shall be in form and substance satisfactory to the DIP Lender, and with such prior notice to the necessary parties as required by Bankruptcy Rule 4001 or otherwise. |
| Events of Default: | "Events of Default": <br> (1) Failure to repay the DIP Loan by the Maturity Date; <br> (2) Dissolution, liquidation, or conversion of the Bankruptcy Case to Chapter 7; |

---

[1] The Carve Out will be limited to amounts set forth in an agreed to budget which accrued prior to the date of a notice of an Event of Default under the DIP Loan and remain unpaid.

{00357523-2}                                                                                                                              7

(3) Reversal, vacation or stay of the Order granting approval for the DIP Loan;

(4) Failure by the Debtor to comply with any material provision of the Order granting approval of the DIP Loan;

(5) The failure of the Debtor to obtain an Order compelling CFM to perform on the contract, or the entry of an Order reversing, modifying, or materially changing any order requiring CFM to perform on the contract.

(6) The termination of the CFM contract;

(7) The cessation of business operations of the Debtor;

(8) Unless otherwise agreed in writing by the Lender, the filing of any plan of reorganization by the Debtor or supported by the Debtor.

(9) Entry of an order confirming a plan of reorganization that does not: (i) contain a provision for payment in full of all outstanding DIP Obligations on or before the effective date of such plan; and (ii) provide for the continuation of the DIP Lender Lien until such effective date;

(10) Entry of an order: (i) appointing a trustee under Section 1104; (ii) appointing an examiner with enlarged powers (beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the business under Section 1106(b) of the Bankruptcy Code; (iv) revoking, reversing, staying for a period in excess of fourteen (14) days, vacating or rescinding any provision of this Order; (v) modifying, supplementing or amending any provision of this Order without the consent of the DIP Lender; (vi) permitting any administrative expense, other debtor-in-possession financing or any claim on the Property (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Debtor, which is equal or superior in priority to the Super-Priority Claim of the DIP Lender, except in respect of the Carve-Out; (vii) granting or permitting the grant of a lien on the Property other than liens permitted under the DIP Loan Agreement; and/or (viii) dismissing the Bankruptcy Case which dismissal does not contain a provision for termination of the DIP Lender's Commitment and payment in full in cash of all DIP Obligations upon such dismissal;

(11) Entry of an order granting relief from the automatic stay to the holder or holders of any liens on DIP Lender Collateral to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on the Property;

(12) Any material provision of the Order approving the DIP Loan or the DIP Loan Agreement ceases to be valid or binding or enforceable against the Debtor;

| | |
|---|---|
| | (13) The Debtor seeks to, or supports (whether by way of motion or other pleadings filed with the Bankruptcy Court) any other party's motion to: (i) disallow in whole or in part any of the DIP Obligations; or (ii) challenge the validity or enforceability of the DIP Lender Lien or security interests granted or confirmed in the DIP Loan Agreement or in this Order in favor of the DIP Lender;<br>(14) Entry of an order avoiding or requiring disgorgement by the DIP Lender of any amounts received in respect of the DIP Obligations;<br>(15) The Debtor executes an agreement (including any letter of intent) for the sale to any third party of all or any portion of the Property, or other material assets of the Debtor (the date of such execution being the date of such default); or<br>(16) The Debtor fails to meet the Budget attached as Exhibit "A" allowing for a 5% variance in any one item. |
| <u>Remedies:</u> | Upon an Event of Default, DIP Lender will provide notice of such default to the Debtor and the U.S. Trustee. Upon the expiration of a 3 day cure period, if the Event of Default has not been cured in a manner acceptable to the DIP Lender, the DIP Lender may file a notice of default. Upon the filing of the notice of default, the automatic stay shall be lifted, automatically, and without further order of the Court, allowing the DIP Lender to foreclose on the DIP Collateral and to obtain the full and indefeasible repayment of all DIP Obligations. |
| <u>Carve Out:</u> | "<u>Carve Out</u>" means (i) the accrued, unpaid and allowed professional fees and costs of Debtor's counsel and any committee counsel up to the amount of $50,000.00; and (ii) the payment of fees to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. §1930; provided, that no portion of the Carve Out shall be utilized for the payment of professional fees and disbursements incurred in connection with any challenge to the amount, extent, priority, validity, perfection or enforcement of the indebtedness of the Borrower owing to the DIP Lender. |

19. The Debtor requests that the Court enter an interim order as soon as practicable to allow the Debtor access to financing immediately to allow the Debtor to make the payments set forth in the budget approved by the DIP Lender.

**WHEREFORE**, for the foregoing reasons, FlyGlo, LLC respectfully requests that the Court grant its Motion for Interim and Final Orders (1) Authorizing and Approving Debtor's

Post-Petition Financing; (2) Granting Security Interests and Providing Superpriority Administrative Expense Status; and (3) Modifying Automatic Stay Pursuant to 11 U.S.C. §§ 105, 362, 363 and 364 and Federal Rules of Bankruptcy Procedure 2002 and 4001 and enter an interim order.

April 24, 2017

*/s/ Douglas S. Draper*
Douglas S. Draper, La Bar No. 5073
Leslie A. Collins, La Bar No. 14891
Greta M. Brouphy, La Bar No. 26216
Heller, Draper, Patrick, Horn & Dabney, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130-6103
Office: 504 299-3300/Fax: 504 299-3399
E-mail: ddraper@hellerdraper.com
E-mail: lcollins@hellerdraper.com
E-mail: gbrouphy@hellerdraper.com

*Proposed Attorneys for the Debtor*

And

Brent Barriere, LA Bar No.2818
Loretta G. Mince, LA Bar No. 25796
Fishman Haygood, LLP
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170
Office: 504.586.5252
bbarriere@fishmanhaygood.com
lmince@fishmanhaygood.com

{00357523-2} 10