UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: | * | CASE NO. 17-11015 |
| | * | |
| FLYGLO, LLC | * | CHAPTER 11 |
| | * | |
| DEBTOR | * | JUDGE JERRY A. BROWN |

\*   \*   \*   \*   \*   \*   \*   \*

**MOTION AND INCORPORATED MEMORANDUM FOR ORDER UNDER 11 U.S.C. §
105(a) HOLDING DEBTOR AND ITS PRINCIPAL IN CONTEMPT AND UNDER
11 U.S.C. § 503 FOR ALLOWANCE OF ADMINISTRATIVE EXPENSE CLAIM**

Wells Fargo Bank Northwest, National Association, not in its individual capacity but solely as Owner Trustee for the benefit of Alandia Air Ab ("Alandia"), respectfully moves this Court to hold FlyGlo LLC, debtor in possession herein ("Debtor"), and the Debtor's principal, Calvin Fayard ("Fayard") in contempt of court and to allow, and order the payment of, Alandia's administrative expense claim, as follows:

**Jurisdiction and Venue**

This court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157(b) and 1334(b). This matter is a core proceeding under 28 U.S.C. § 157(b). Venue is appropriate in this court. 28 U.S.C. § 1409(a).

**Background**

In support of this Motion, Alandia references the Affidavit of Jörgen Gustafsson, the Chief Executive Officer of Alandia Air Ab ("Affidavit").[1]

---

[1] Alandia will file the signed Affidavit upon receipt.

Alandia is the beneficial owner of three aircraft (collectively "Aircraft") which are leased to the Debtor pursuant to (i) that certain Aircraft Lease Agreement Number: AA-FG01 dated as of August 28, 2015 ("N220MJ Lease"), (ii) that certain Aircraft Lease Agreement Number: AA-FG02 dated as of October 15, 2015 ("N9CJ Lease"), and (iii) that certain Aircraft Lease Agreement Number: AA-FG03 dated as of December 1, 2015 ("N346CJ Lease")(collectively "Leases"). A copy of each of the Leases are attached to the Affidavit as Exhibit A.  Thereafter, the Debtor entered into certain Aircraft Sublease and Maintenance Agreements with Corporate Flight Management, Inc. ("CFM") under which the Debtor subleased the Aircraft to CFM.

At the time that the Debtor commenced this case on April 23, 2017, the Debtor owed Alandia more than $1,200,000 and was in default of important nonmonetary obligations under the Leases.  On April 28, 2017, Alandia filed a Motion and Incorporated Memorandum to Lift Automatic Stay ("Motion") [Doc. 29] seeking immediate return of the Aircraft.  After extensive negotiations, the parties stipulated to, and this Court entered, the Order Approving Agreement Relating to Motion to Lift Automatic Stay (the "Order"), which included the following relevant provisions (emphasis added):

> IT IS HEREBY ORDERED that that on or before July 31, 2017, the Debtor shall surrender each aircraft and related property and documents subject to each Lease (individually and collectively, "Aircraft") and *redeliver each such Aircraft to Alandia in accordance with (including, without limitation, in the condition required by) each Lease (except that redelivery may be made in New Orleans, LA), and cooperate with Alandia in it obtaining possession of the Aircraft* with respect to each Lease unless, with respect to a specific Lease, an order is entered on or before July 31, 2017 authorizing the Debtor to assume such Lease pursuant to 11 USC 365.

> \*\*\*

> IT IS HEREBY ORDERED that the *Debtor shall timely perform all post-petition obligations under the Leases*, including, without limitation, (i) timely payment of post-petition *rent* in accordance with the Leases, (ii) *timely payment of post-*

2

*petition amounts due to GE Engine Services, LLC or other appropriate General Electric Aviation affiliate* ("GE") under the GE Engine Care Maintenance Plan ("ECMP") Program Engine Services Agreement ("ECMP Agreement") covering the engines attached to the Aircraft (collectively "Engines"), (iii) *continuing coverage of the Engines in the GE ECMP Program* (subject to Paragraph (I) below), (iv) timely payment of *post-petition Maintenance Reserves* in accordance with the Leases, (v) timely payment of all post-petition fees, costs and taxes owed in connection with continuing possession, use and operation of the Aircraft, including, without limitation, license and registration fees, and costs of fuel, service and parts for the Aircraft, (vi) *timely maintenance* of the Aircraft in good operating condition and in accordance with the post-petition requirements (including unsatisfied pre-petition requirements) contained in the Approved Maintenance Program (as such term is defined in the Leases), (vii) insuring the Aircraft in accordance with the terms of the Leases, and (viii) *timely payment of any and all amounts required to remove, release or avoid the imposition of any post-petition Liens* (as such term is defined in the Leases) on the Aircraft.

***

IT IS HEREBY ORDERED that the Debtor has represented that GE at this time has agreed to continue to perform under the GE ECMP Agreement.  If GE obtains a Court Order terminating or allowing GE to suspend performance under the GE ECMP Agreement the Debtor shall immediately surrender the Aircraft to Alandia and the stay shall be immediately lifted to allow Alandia all rights and remedies to take possession of and recover the Aircraft, without the necessity of Alandia obtaining any further order from this Court.

As reflected by these provisions, a critical component to the Order, and Alandia's agreement to allow the Debtor to continue to operate the Aircraft, was the requirement that the Debtor return the Aircraft to Alandia in accordance with the Leases.  The Debtor and Mr. Fayard understood the importance of these provisions to Alandia as they were extensively discussed and negotiated.

Returning a leased commercial aircraft to its owner is not like returning a rental car at the airport.  Proper return of the Aircraft, including all of its component items of equipment and documentation, is essential to the safety and value of the Aircraft and the Aircraft's eligibility for re-lease to another party, and is a critical Lease provision which the parties negotiated into the Order.  Under section 12.1 of the Leases, the Debtor is required to return the Aircraft to Alandia at Debtor's expense:

… in a condition complying with Schedule 4 [of the Leases], free and clear of all Liens (other than Lessor Liens) and in a condition qualifying for immediate issuance of a standard certificate of airworthiness from the Federal Aviation Administration of the United States of America, or as otherwise agreed by Lessor and Lessee.  Lessor agrees to comply fully with all requirements set out in Schedule 4 [of the Leases].  (emphasis added)

The Schedule 4 conditions include, but are not limited to, the Debtor returning the Aircraft: (i) in good operating condition with all equipment and systems functioning properly (Schedule 4, Art. 1(a)); (ii) with a Certificate of Airworthiness (Schedule 4, Arts. 1(b) and 1.1); (iii) in compliance with all mandatory service bulletins, orders, directives and instructions affecting the Aircraft (Schedule 4, Arts. 1(d) and 1.1); (iv) with all deferred maintenance completed (Schedule 4, Art. 1(e)); (v) with all corrosion repaired (Schedule 4, Art. 1(f)); (vi) free and clear of all liens (Schedule 4, Art. 1(g)); (vii) in the same configuration with all of the same equipment as when delivered to the Debtor (Schedule 4, Arts. 1(h) and 1.1); (viii) with certain airframe inspections having just been performed and certain time remaining until other airframe inspections are required to be performed (Schedule 4, Art. 1.1); (ix) with tires and brakes having at least 50% remaining service life (Schedule 4, Art. 1.1(c)); (x) with controlled components in serviceable condition and having at least the service life remaining as when delivered to the Debtor (Schedule 4, Art. 1.2); (xi) with a video-taped borescope inspection performed on each engine (Schedule 4, Art. 1.3(a)); (xii) with engines eligible for continued ECMP enrollment, not showing adverse performance or oil consumption trends and subject to an ECMP Qualification Letter from GE (Schedule 4, Arts. 1.1, 1.3(b) and 1.3(c)); (xiii) with all uninstalled vendor and manufacturer service bulletin kits (Schedule 4, Art. 1.4); (xiv) newly painted in base white livery and with all of the Debtor's exterior and interior markings removed (Schedule 4, Arts. 1.1 and 1.4); (xv) with all aircraft documentation listed in Exhibit A to Schedule 4 and Article 2.1 of Schedule 4 in the requisite form and manner (Schedule 4, Arts. 2.1 and 2.2); (xvi) with requisite certifications as to accidents, incidents, hard

landings, fires and lightning strikes, and as to parts on the Aircraft (Schedule 4, Art. 2.1(i)-(iii));

(xvii) with vendor documents and data requested by Alandia (Schedule 4, Art. 2.3); and (xviii)

with aircraft safety devices for landing gear downlocks, engine plugs and miscellaneous equipment

(Schedule 4, Art. 2.4).  In addition, the Debtor is required to, at its expense: (1) make the Aircraft

available for required inspection, open aircraft areas to enable such inspection, and correct any

discrepancies found (Schedule 4, Art. 3.1); (2) conduct an operational ground check and correct

any discrepancies found (Schedule 4, Art. 3.2); and (3) conduct an operational test flight and

correct any agreed-upon discrepancies (Schedule 4, Art. 3.3).  All of the foregoing requirements

and the other items set forth in Schedule 4 and Section 12 of the Lease are referred to collectively

as the "Return Conditions".  The Return Conditions are set forth in detail in the Lease and the

above list is descriptive only and is qualified in its entirety by the actual provisions set forth in the

Lease and incorporated herein by reference.

Alandia and the Debtor specifically agreed to the Return Conditions in the Lease, and, in

the Order, specifically negotiated that the Debtor would be required to adhere to the Return

Conditions upon rejection.  As stated in the Order, the only Return Condition which Alandia and

the Debtor agreed would not apply is that the parties agreed that redelivery of the Aircraft could

be made in New Orleans, LA rather than Bangor, ME.  Other than this one Return Condition, the

Debtor agreed to comply with all of the Return Conditions.  More importantly, the Court ordered

the Debtor to comply with the Return Conditions.  Alandia would not have agreed to the Debtor's

continued operation of the Aircraft without this provision in the Order.

On the afternoon of Friday, June 30, 2017 (the Friday before the Fourth of July weekend),

Mr. Fayard sent Alandia's representative (who lives in Finland) the following email:

> **Från:** Trey Fayard [mailto:trey@flyglo.com]
> **Skickat:** den 30 juni 2017 22:24

**Till:** Jörgen Gustafsson <jorgen@alandiaair.com>
**Ämne:** Rents and 220

Jorgen

Due to lack of the ability of CFM to adequately staff and fly a full schedule for July we are returning N220MJ lease AA-FG01 to you effective today.  CFM has constantly changed their position even from the recent filings in court last week. As such, we are forced to reject this lease, and Alandia should retake possession of this aircraft which is currently located at B15 in MSY.

I have ordered the July rents for the additional 2 aircrafts and you will see that reflect in your account. It usually takes a day or two for overseas wires to reflect as you know. Additionally, next Tuesday is a national holiday and the banks will be closed. I assume this transfer will reflect on Monday. I will send you a wire confirm once I receive.

Trey

A copy of this email is attached to the Affidavit as Exhibit B.  Early on Saturday, July 1, 2017,

Alandia's representative replied to Mr. Fayard's email as follows:

Trey, not much of a heads up on that rejection. Well pls send me the ECMP Qualification letters and supporting borescope inspection reports and performance runs, capped and un-capped GPA's that you sent to GE for evaluation and approval.

Also confirm that the aircraft is returned with Alandia engines and propellers installed as per the lease agreement and that no deferred maintenance etc.

Confirm that you cleared the lien on the aircraft prior to return.

Looking forward to receive the above asap so that we can get the aircraft moving.

//Jorgen

A copy of this email is attached to the Affidavit as Exhibit C.  Mr. Fayard did not respond to this

email nor provided the requested documentation and other information.

On July 3, 2017, Alandia's counsel issued a letter to the Debtor's counsel reminding the

Debtor of its obligations to return the N220MJ Aircraft in accordance with the Return Conditions,

requesting that the Debtor advise when the N220MJ Aircraft will be ready for return under the

Order and the Lease, advising that Alandia is prepared to make arrangements to inspect and take

possession of the N220MJ Aircraft when it heard back from the Debtor, and rejecting Mr. Fayard's contention in his June 30, 2017 email that the N220MJ Aircraft has been returned effective June 30, 2017.  A copy of this letter is attached to the Affidavit as Exhibit D.  Counsel for the Debtor did not respond to this correspondence.  On July 7, 2017, counsel for Alandia emailed counsel for the Debtor, stating:

> Doug and Lori, just following up on my attached letter to you of July 3, 2017.  I have not received a response from you (and my client has not heard back from Mr. Fayard in response to my client's email of July 1, 2017).  I assume that this means that the Debtor is working on the redelivery conditions and you will let us know when the aircraft is ready.  However, please advise if this is not correct.  Thanks David.

A copy of this email is attached to the Affidavit as Exhibit E.  Counsel for Alandia did not receive a response to this email.  On July 10, 2017, counsel for Alandia was able to reach counsel for the Debtor by phone.  Counsel for the Debtor advised that the Debtor would obtain removal of the improper Empire lien through its pending motion and that Mr. Fayard would be in touch with Alandia's representative about the other Return Conditions.

On July 11, 2017, Mr. Fayard sent an email to Alandia's representative advising that the Debtor would be returning the other two Aircraft to Alandia.  A copy of this email is attached to the Affidavit as Exhibit F.  In this email, Mr. Fayard advises that "I have contacted GE and asked for coverage letters for the engines for all 3 aircraft.  I am awaiting a response and will let you know when I hear back from them."  Mr. Fayard did not address the status of any of the other Return Conditions.

On July 13, 2017, Alandia's representative again emailed Mr. Fayard and asked whether he intended to "...contact [him] to discuss how to handle the return conditions of the aircraft" and requesting that Mr. Fayard advise him of the status of one of the leased engines that had not been returned and was believed to be at H+S Aviation, an engine repair shop ("H+S"), and that Mr.

Fayard send him the weekly status report from H+S.  A copy of this email is attached to the Affidavit as Exhibit G.

Mr. Fayard replied to the July 13, 2017 email from Alandia's representative confirming that one of the leased engines was at H+S and addressing, without committing to comply with, the request for the status report from H+S.  A copy of this email is attached to the Affidavit as Exhibit H.

Alandia's representative replied to Mr. Fayard's July 13, 2017 email response as follows:

Trey, Since the engine is sent out under GLO ECMP Contract the status report should be sent to your listed contact person. That was probably Bill Lange at the time and I don't know whom his successor been. I would suggest you contact Mr Jamie Howison jamie.howison@hsaviation.co.uk  and ask for the status report as if you sent the engine in beginning May it should be ready soon if not already.

That's about the engines. What about the other return conditions, are they scheduled to be performed in New Orleans?

Thanks Jorgen

A copy of this email is attached to the Affidavit as Exhibit I.

At the July 19, 2017 hearing on the Debtor's Motion to Reject Lease AA-FG01, Alandia explained to the Court its complete frustration with the Debtor's and Fayard's refusal to comply with the Return Conditions and their refusal to communicate with Alandia regarding same.   The Court chastised Mr. Fayard for not appearing at the hearing and reminded him of his fiduciary duty to the estate.   However, even after this admonition, the Debtor and Fayard continue to ignore their obligations under the Order and the Bankruptcy Code.

Not only has the Debtor and Fayard failed to obtain Alandia's engine which apparently remains in a repair shop in England, the Debtor and Fayard removed Alandia's propeller from another of its Aircraft and replaced the propeller with a rental one (which has since been removed by the lessor of the propeller).   On August 3, 2017, Alandia emailed Fayard as follows:

8

> Trey,
> I found out from SAAB that there was no exchange done for the propeller on 220. You have a rental propeller installed that has to be returned to SAAB asap. What I understand is that our propeller was sent to Dowty for O/H (or repair) but has no information beyond that. Could you pls sort this out and make sure we get an SV propeller back on 220. One suggestion would be to discuss with SAAB to buy the one currently installed. It is about midlife and could be an acceptable replacement for us. I think that should be the cheapest option for you.

The Debtor and Fayard have failed to respond to this email. Having sent Alandia's engine and propeller off to repair shops (and then failing to pay for the repairs), the Debtor and Fayard now refuse to retrieve Alandia's propeller and engine.

To make matters worse, and despite its express representation in the Order that it would timely pay GE postpetition amounts due under the ECMP Agreement and that it would maintain the engines in the EMCP Program, and despite its express representation in the Order that GE had agreed to continue to perform under the ECMP Agreement, the Debtor failed to pay *any* postpetition amounts due to GE. While the Debtor blamed a billing error caused by CFM misstating the hours of use on the Aircraft, even after this error was corrected, the Debtor still failed to pay GE. As a result, the engine will not be repaired under the ECMP Program. Moreover, the Debtor's failure to pay GE prevents the Debtor from obtaining the ECMP Qualification Letters on the engines, singularly the most important Return Condition which is so critical to the value of the Aircraft. The Debtor has destroyed the value of Alandia's Aircraft during the pendency of this case.

With its engine missing from its N9CJ Aircraft and its propeller missing from its N220MJ Aircraft, and the Debtor's and Fayard's refusal to comply with the Return Conditions (or even communicate in good faith with Alandia regarding the Return Conditions), Alandia has been forced to incur additional and unnecessary expenses to secure what is left of its property. Alandia is still compiling these amounts and will supplement this motion when these amounts are

determined. To date, Alandia's administrative expense claim is comprised of unpaid amounts due under the Leases and amounts arising from the Debtor's failure to return the Aircraft in compliance with the Return Conditions as follows:

| Cost Description | Cost Amount | Running Cost Subtotal |
|---|---|---|
| Rent for N220MJ (July 1 – July 19) | $17,161.29 | $17,161.29 |
| Maintenance Reserves (June 1 – June 30) | $32,335.20 | $49,496.49 |
| Maintenance Reserves (July 1 – July 15) | $7,030.00 | $56,526.49 |
| ECMP Charges (May 1 – May 31) | $96,028.17 | $152,554.66 |
| ECMP Charges (June 1 – June 30) | $60,137.06 | $212,691.72 |
| ECMP Charges (July 1 – July 15) | $9,556.40 | $222,248.12 |
| GE To obtain ECMP Letters | $768,699.00 | $990,947.12 |
| Empire lien | $246,326.63[2] | $1,237,273.75 |
| Re-Paint of 3ea aircraft | $156,000.00 | $1,393,273.75 |
| Engine | unknown | unknown |
| Propeller O/H estimate (quote pending from Dowty) | $70,000.00 | $1,463,273.75 |
| C-Chk 2ea Aircraft | $240,000.00 | $1,703,273.75 |
| Propeller O/H (Due on 220) | $70,000.00 | $1,773,273.75 |
| 30000/12000cycl Fatigue inspection two aircraft | $300,000.00 | $2,073,273.75 |
| A-B and 4/2 year on three aircraft (Estimate) | $75,000.00 | $2,148,273.75 |

Because of the complete lack of cooperation from the Debtor, Alandia was only able to retrieve its Aircraft in the last couple of days and has not yet been able to assess the condition of the Aircraft. Alandia will likely incur additional costs to put all equipment and systems in good operating condition, complete all deferred maintenance, repair all corrosion, compensate for the tires and brakes not being at mid-life, putting all controlled components in serviceable condition with a

---

[2] The Debtor filed a Motion to Hold Empire In Contempt because Empire filed its lien in violation of the stay and the lien should be stricken. Alandia intervened in and supported this Motion which is currently under advisement. Assuming the Empire Lien is stricken, Alandia's claim will be reduced by the amount of the Empire lien.

service life as at delivery, and perform videotaped boroscope inspections all as required by the Return Conditions and the Order. Alandia will supplement its claim when these amounts are known.

In addition, Alandia has not included August rent under the N9CJ Lease and N346CJ Lease even though the Debtor failed to file motions to reject these Leases. While the Debtor advised Alandia that it would no longer be using the Aircraft subject to these leases and that Alandia may retrieve the Aircraft, the Debtor refused to file a motion to reject these leases despite Alandia's request that they do so (and despite its offer to stipulate that the leases are rejected as of July 31, 2017). Accordingly, Alandia reserves the right to supplement its claim for rent under the N9CJ Lease and N346CJ Lease through the date of rejection.

The Debtor's and Mr. Fayard's refusal to comply with the Return Conditions and payment provisions in the Order is inexcusable. When the issues were brought to the Court's attention on July 19, 2017, the Debtor provided no excuse for its failure to address the issues with Alandia (which had been described in Alandia's Opposition to the Motion to Reject the N220MJ Lease). The Debtor made no effort to surrender the property leased to the Debtor under the Leases. The engine and propeller have been left by the Debtor at repair shops, and only the Debtor, as the contracting party responsible for payment for the services at such repair shops, is authorized to retrieve such property from the repair shops. The Debtor and Fayard simply refuse to comply with these and the other Return Conditions as required by the Order.

Alandia suspects that the Debtor and Fayard may seek to excuse their failure to comply with the Order because the Debtor ran out of money. However, the Court should reject this excuse for three reasons. First, the Debtor represented to Alandia that it had sufficient capital to comply with the Order by its agreement to the terms of the Order. If the Debtor did not have sufficient

capital, the Debtor should not have entered into the Order and lured Alandia into allowing the continued use of its Aircraft. Orders, and particularly consent orders, must mean something (or in future cases parties in interest may not seek to consensually work with debtors). Second, on the day of its bankruptcy filing, the Debtor filed a motion to approve $750,000 in postpetition financing ("DIP Loan") from Wyoming Aviation which it represented was majority owned by the Debtor's owner Fayard. [R.Doc. 10]. In the DIP Motion, the Debtor represented that it would use the $750,000 to fund its operations during the case and to pay administrative expense claims. This Court approved the DIP Loan in its Order entered on April 28, 2017. [R.Doc. 28]. Based upon the June Monthly Operating Report (which contains asterisks and notes stating that further information is needed), the Debtor had at least $250,000 available on its DIP Loan. At a minimum, the Debtor and Fayard should be ordered to draw on the remaining DIP Loan to satisfy administrative expense claims. Indeed, Wyoming Aviation signed the Order (as well as the Debtor). Third, the Debtor's and Fayard's failure to comply with the Order extends beyond the payment of funds. The Debtor and Fayard refused to respond to numerous emails and telephone calls from Alandia seeking to coordinate the surrender of the Aircraft (including Alandia's propeller and engine which it abandoned at repair shops). As reflected by the Affidavit, the Debtor and Fayard refused to even extend Alandia the courtesy of advising that they would not be complying with the Order.

## Relief Requested

Alandia requests that this Court hold the Debtor and Fayard in contempt of the Order and order that the Debtor and Fayard pay Alandia its administrative expense claim in full within 10 days. Bankruptcy courts derive their civil contempt authority from §105(a), which provides:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or

appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

*In re Count Liberty, LLC*, 370 B.R. 259, 270 (Bkrtcy. C.D. Ca. 2007)(listing cases); *In re Bradley*,

588 F.3d 254, 266 (5th Cir. 2009)(Recognizing that bankruptcy courts have civil contempt power).

In a civil contempt action, the moving party has the burden of establishing "by clear and

convincing evidence that the contemnors violated a specific and definite order of the court. The

burden then shifts to the contemnors to demonstrate why they were unable to comply." *Id.* citing

*FTC v. Affordable Media, LLC,* 179 F.3d 1228, 1239 (9th Cir.1999).

 The Court In *In re Snider Farms, Inc.*, 125 B.R. 993 (Bkrtcy. N.D. Ind. 1991) explained

its civil contempt power as follows:

> Since civil contempt serves a remedial purpose by either coercing a respondent into compliance with the Court's Order or compensating the complainant for losses sustained, willfulness of the offending party need not be shown for a finding of contempt; it is sufficient that the Court order violated is specific and definite and that the offending party has knowledge of the Court's order. *In re Skinner*, 90 B.R. 470, 474 (D.Utah 1988), citing, *McComb v. Jacksonville Paper Co*., 336 U.S. 187, 69 S.Ct. 497, 93 L.Ed. 599 (1949). *In re Lohnes*, 26 B.R. 593, 596 (Bankr.D.Conn.1983); *In re Demp*, 23 B.R. 239, 240 (Bankr.E.D.Pa.1982). That is to say willfulness is not an essential element of civil contempt. *In re Crabtree*, 39 B.R. 702, 710 (Bankr.E.D.Tenn.1984); *In re Ashby*, 36 B.R. 976, 978 (Bankr.D.Utah 1984). Civil contempt may be established even though the failure to comply with the court order was unintentional, and done with good intentions. *Perry v. D. Donnell*, 759 F.2d 702, 705 (9th Cir.1985), citing, *Commodity Futures Trading Commission v. Premex*, 655 F.2d 779, 784 (7th Cir.1981). A party may be found in civil contempt if he has not been "reasonably diligent and energetic in attempting to accomplish what was ordered," *Stotler v. Able*, 870 F.2d at 1163, supra, quoting, *American Fletcher Mortgage Co. v. Bass*, 688 F.2d 513, 517 (7th Cir.1982). Orders of the Courts must be complied with and an appeal is the remedy for a decision believed to be erroneous. Thus, good faith alone does not immunize a party from a civil contempt sanction for noncompliance with a Court order. *McLean v. Central State, etc*., 762 F.2d 1204, 1210 (4th Cir.1985). Accidental, inadvertent or negligent conduct can be grounds for imposing civil contempt sanctions. *In re Shafer*, 63 B.R. 194, 198 (Bankr.D.Kan.1986).

13

The Court in *Snider Farms* held the debtor's principal in contempt because "the Respondent, as responsible executive officer of the Debtor, and legally identified with it, can be held in contempt, because the Debtor failed to comply with the Court's orders." *Id.* at 999.

Likewise, the Fifth Circuit in *In re Bradley*, 588 F.3d 254, 263-264 (5th Cir. 2009) affirmed a bankruptcy court's contempt order against the trustee of a trust for the damages caused by his contemptuous conduct even though the court's order was not in writing:

> Like criminal contempt, remedial civil contempt is backward-looking. But remedial contempt is civil, because it remedies the consequences of defiant conduct on an opposing party, rather than punishing the defiance per se. It accordingly does not require the special safeguards that accompany criminal contempt proceedings, such as establishment of mens rea and proof beyond a reasonable doubt. *See McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 193, 69 S.Ct. 497, 93 L.Ed. 599 (1949) (holding that remedial civil contempt does not require proof of criminal intent); *Griffith v. Oles (In re Hipp, Inc.),* 895 F.2d 1503, 1509 (5th Cir.1990) (discussing character of criminal contempt as a "crime in the ordinary sense," requiring a presumption of innocence, proof beyond a reasonable doubt, and protection against self-incrimination). The present proceeding is a remedial civil contempt proceeding, because the bankruptcy court held Beutel liable to the bankruptcy estate rather than imposing a fine payable to the court.

In this case, the Order was not only written and signed by the Court, the Order was also signed by the Debtor, through Fayard, and Wyoming Aviation.

In holding a debtor's corporate officer in contempt of its order directed to the debtor, the Court in *In re Count Liberty, LLC*, 370 B.R. 259, 270 (Bkrtcy. C.D. Ca. 2007) explained the debtor's officers and directors owe a fiduciary duty to comply with the Court's orders:

> By virtue of § 1107(a), a chapter 11 debtor in possession stands in the shoes of a trustee and is a fiduciary for the estate and its creditors. *See, e.g., Thompson v. Margen (In re McConville),* 110 F.3d 47, 50 (9th Cir.1997) (stating that chapter 11 debtors in possession "were fiduciaries of their own estate owing a duty of care and loyalty to the estate's creditors"), *cert. denied,* 522 U.S. 966, 118 S.Ct. 412, 139 L.Ed.2d 315 (1997); *Woodson v. Fireman's Fund Ins. Co. (In re Woodson),* 839 F.2d 610, 614 (9th Cir.1988) ("As debtor in possession he is the trustee of his own *276 estate and therefore stands in a fiduciary relationship to his creditors" (footnote omitted)); *Devers v. Bank of Sheridan, Montana (In re Devers),* 759 F.2d

751, 754 (9th Cir.1985) ("A debtor-in-possession has the duty to protect and conserve property in his possession for the benefit of creditors").

When the debtor is a corporation, the debtor in possession's fiduciary obligations to the corporation, its creditors and shareholders, fall upon the officers and directors. *See Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 355, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985) (stating that "the debtor's directors bear essentially the same fiduciary obligation to creditors and shareholders as would the trustee for a debtor out of possession"); *Wolf v. Weinstein,* 372 U.S. 633, 649, 83 S.Ct. 969, 10 L.Ed.2d 33 (1963) (observing that "so long as the Debtor remains in possession, it is clear that the *corporation* bears essentially the same fiduciary obligation to the creditors as does the trustee for the Debtor out of possession" (emphasis in original)); *Holta v. Zerbetz (In re Anchorage Nautical Tours, Inc.),* 145 B.R. 637, 643 (9th Cir.BAP1992) ("When the debtor is a corporation, corporate officers and directors are considered to be fiduciaries both to the corporate debtor in possession and to the creditors.").

Corporate officers, as fiduciaries, must protect and preserve estate assets held in trust for the benefit of creditors. *Holta,* 145 B.R. at 643; *Hirsch v. Penn. Textile Corp. (In re Centennial Textiles, Inc.),* 227 B.R. 606, 612 (Bankr.S.D.N.Y.1998) ("As fiduciaries, the debtor in possession and its managers are obligated to treat all parties to the case fairly, maximize the value of the estate, and protect and conserve the debtor's property" (internal citations omitted)). In this regard, the Ninth Circuit holds the debtor in possession's corporate officers to the standards of "officers of the court because of their responsibility to act in the best interests of the estate as a whole and the accompanying fiduciary duties." *Gumport v. China Int'l Trust & Inv. Corp. (In re Intermagnetics Am., Inc.),* 926 F.2d 912, 917 (9th Cir.1991); *see York Int'l Building, Inc. v. Chaney (In re York Int'l Building, Inc.),* 527 F.2d 1061, 1068 (9th Cir.1975) (noting that special masters administering bankruptcy estates "are not acting as private persons, but as officers of the court").

Numerous other courts have either sanctioned or held in contempt such a non-party individual for the actions or non-actions of that corporation. *See, e.g., Ferrara v. Nordeve, LLC*, 2012 WL 1999643 at *4 (E.D.N.Y. Apr. 10, 2012) (Report & Recommendation), adopted, 2012 WL 2017501 (E.D.N.Y. May 30, 2012) (recommending that non-party be held in contempt for failure of corporation to comply with court order where "she clearly had control over Nordev and access to the information and documents sought"); *Jones v. Regent Asset Mgmt. Solutions, Inc.*, 2011 WL 2037626 at *3 (D.Conn. May 24, 2011) (noting that it was proper to hold non-party individual in

contempt where "there was a strong degree of identity between Defendant Regent Asset Management Solutions, Inc. and its President, CEO, and sole stockholder, Michael Scata"); *Amerisource Corp. v. Rx USA Int'l Inc.*, 2010 WL 2730748 at *5 (E.D.N.Y. July 6, 2010) (concluding that the court had the inherent power to sanction a non-party where the non-party was the majority shareholder and chief executive and managed the litigation on behalf of the defendant); *Diamant v. GMS Diamonds Corp.*, 2004 WL 2710028 at *1 (S.D.N.Y.2004) (concluding that principal and sole shareholder of a corporation could be held in contempt for corporation's failure to comply with a subpoena); *Spectacular Venture, L.P. v. World Star Int'l, Inc.*, 927 F.Supp. 683, 685 (S.D.N.Y.1996) (holding in contempt individual non-party who was the president and principal of defendant that failed to comply with court order). In addition to its contempt power, this Court also has authority to sanction the Debtor and Fayard under Bankruptcy Rule 9011.

Fayard, as the sole member and manager of the Debtor, placed the Debtor into a Chapter 11 bankruptcy but failed to exercise his duties as an officer of the Debtor to comply with the Order (to which he as an officer of the Debtor and Wyoming Aviation agreed). Both the Debtor and Fayard should be held in contempt of court and ordered to pay the administrative expense claim of Alandia in full within 10 days.

In addition, Alandia seeks formal allowance of its administrative expense claim. Alandia's claim set forth herein constitute the actual and necessary costs of the estate and, and were in fact incurred as ordered by the Court as set forth in the Order. Under Bankruptcy Code section 503, Alandia is entitled to allowance of its administrative expense claim and entitled to an order directing the Debtor to immediately pay such claim.

**Conclusion**

The Debtor, and its principal Fayard, have failed to comply with the Order.  The Debtor's and Fayard's complete indifference to this Court's Order and their obligations in this proceeding are extraordinary.  The Debtor and Fayard failed to advise Alandia that they would not comply with the Order much less offer an excuse for failing to comply with the Order.  The Debtor and Fayard have left Alandia's engine and propeller in far flung repair shops and their engines out of the extremely important ECMP Program.  The Debtor and Fayard destroyed the value of Alandia's property without even saying "I'm sorry".  Alandia is now left to pick up the pieces.  Alandia requests that this Court issue the strongest contempt order possible in hopes of compelling the Debtor and Fayard to comply with their obligations in this case.  Alandia further requests that this Court allow its administrative expense claim as established at the hearing on this Motion.

Alandia reserves all other rights and remedies with respect to Fayard, the Debtor and Wyoming Aviation and any other officers and directors of the Debtor and Wyoming Aviation.

Respectfully submitted,
CARVER, DARDEN, KORETZKY, TESSIER
FINN, BLOSSMAN & AREAUX, L.L.C.

/s/ David F. Waguespack
DAVID F. WAGUESPACK (#21121)
PETER SEIGRIST (#35314)
1100 Poydras Street, Suite 3100
New Orleans, Louisiana 70163
Telephone: (504) 585-3814
Fax: (504) 585-3801
Counsel for Wells Fargo Bank Northwest, National
Association, not in its individual capacity but solely as
Owner Trustee for the benefit of Alandia Air Ab

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon counsel for the Debtor, Douglas S. Draper, Heller Draper Patrick Horn & Dabney, LLC, 650 Poydras Street, Suite 2500, New Orleans, LA 70130-610; and the Office of the U. S. Trustee, Amanda B. George, 400 Poydras Street, Suite 2110, New Orleans, LA 70130; by ECF filing and by depositing same in the U. S. Mail, postage prepaid and addressed accordingly and on the Members of the Committee of Unsecured Creditors, Aviation Inventory Resources, Inc., Attn. Morgan Whitehead, 12240 E. FM Highway 917, Alvarado, TX 76009 (email mwhitehead@avinres.com), Worldwide Aircraft Services, Inc., Attn. David Vorbeck, 2755 N. General Aviation Ave., Springfield, MO 65803 (email dave.vorbeck@wwair.com); counsel for Empire Airlines, Inc., Lance J. Arnold, Baldwin Haspel Burke & Mayer, LLC, Energy Centre, 36th Floor, 1100 Poydras Street, New Orleans, LA 70163 (email arnold@bhbmlaw.com) by email and by depositing same in the U. S. Mail, postage prepaid and addressed accordingly, on this 9th day of August, 2017.

/s/ DAVID F. WAGUESPACK
DAVID F. WAGUESPACK

4839-1480-2764, v. 1