UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: | CASE NO. 17-11015 |
| FLYGLO, INC. | SECTION "B" |
| DEBTOR | CHAPTER 7 |

## MEMORANDUM OPINION

This matter came before the court on September 14, 2017 as a hearing on the Motion for Order Under 11 U.S.C. § 105(a) Holding Debtor and Its Principal in Contempt and Under 11 U.S.C. § 503 for Allowance of Administrative Expense Claim (P-158) filed by Wells Fargo Bank Northwest, N.A., not in its individual capacity but solely as Owner Trustee for the benefit of Alandia Air Ab, ("Alandia") and the opposition thereto.  Because the case was converted from a Chapter 11 proceeding to a Chapter 7 proceeding shortly before the hearing, counsel for the newly appointed Chapter 7 trustee and counsel for Alandia agreed to reserve the Chapter 7 trustee's rights to object to the administrative claim at a later date; they also agreed, with the court's permission, that any liability for contempt against the debtor corporation would not be ruled on at this time.  Thus, the only question before the court at the hearing was whether the debtor's CEO, Calvin Fayard, III, could be held in contempt personally.  For the reasons set forth below the court finds that Fayard is personally responsible for the debtor's failure to act to return the airplanes to Alandia in a reasonable manner, and grants the motion for contempt against him in the amount of $105,863.25.

1

I.  **Background Facts**

The debtor, FlyGLO, Inc., filed a petition for relief under Chapter 11 of the United States Bankruptcy Code on April 23, 2017.[1] FlyGLO operated a regional airline serving several states in the Gulf Coast region. FlyGLO did not own any of its planes, but leased aircraft from Alandia. FlyGLO had an arrangement with a company called Corporate Flight Management, LLC ("CFM") to provide all of the flight crew and maintenance. When the case was first filed, Alandia filed a motion for relief from stay to recover its aircraft. The parties reached an agreement before the court was required to hear the matter. That agreement was filed into the record as a Consent Motion for Relief from Stay,[2] and the court entered an order approving the agreement on May 24, 2017.[3] Then, in late June, FlyGLO apparently experienced problems with CFM, and was unable to staff its flights. Among other actions, this resulted in the debtor filing a motion to reject the lease of one of the aircraft on June 30, 2017.[4] Fayard, FlyGLO's CEO, also sent an email on this same date to Jorgen Gustafsson, Alandia's CEO, to inform him of the lease rejection.[5] On July 11, 2017, Fayard sent another email stating that the other two aircraft would be returned to Alandia at the end

---

[1] 11. U.S.C. §§ 101 *et seq.*

[2] Rec. Doc. 73.

[3] Rec. Doc. 79.

[4] Rec. Doc. 119.

[5] Trial Exhibit F.

of the day on July 15, 2017.[6] Shortly thereafter FlyGLO ceased operating, and the Chapter 11 case was converted to a Chapter 7 case on September 1, 2017.

Both the original aircraft leases and the consent agreement approved by the court on May 24, 2017 required FlyGLO to perform certain obligations with respect to the aircraft. Alandia asserts that FlyGLO failed to perform key obligations related to maintenance and paperwork, and that these failures to act devalued the aircraft significantly. Additionally, Alandia argues that FlyGLO failed to make its planes available such that Alandia could actually take possession of the aircraft in a timely manner. Alandia contends that the debtor's principal, Fayard, should be held personally responsible for FlyGLO's failure to perform, because essentially, it was he who failed to take the required actions.

## II.     Legal Analysis

As is often the case when a bankruptcy case is filed, FlyGLO owed a creditor, Alandia, a significant sum, approximately $1.2 million when it filed its Chapter 11 petition. Alandia's CEO, Jorgen Gustafsson ("Gustafsson"), testified that in the immediate time period before the bankruptcy petition was filed, he had been reassured several times by Fayard that some new investors were coming in to help solve FlyGLO's financial difficulties, and that this is why he did not put the airline into default on the lease contracts before the bankruptcy case was filed. This too is not unusual behavior for a distressed company. Once the Chapter 11 was filed, Alandia filed a motion to lift stay to attempt to get its aircraft back, and then

---

[6] Trial Exhibit I. The debtor never filed a motion to reject the leases of the second and third airplanes, but the parties have taken the email as a notice of lease rejection.

Fayard, Gustafsson, and their attorneys negotiated the consent order that the parties submitted to the court, which the court signed on May 24, 2017.[7] Gustafsson testified that the provisions in paragraph E of that order concerning the condition of the aircraft and the means of returning the aircraft were extremely important to his company.[8]

Alandia is asking for civil contempt. The purpose of civil contempt is to coerce compliance with a court order or to compensate another party for the contemnor's violation.[9] Thus,

> Fines in civil contempt proceedings may be levied for either of two purposes: 1) to compensate the complainant, in which case the amount must be limited to actual damages shown, or 2) to compel the contemnor to comply with the court's order, in which case the amount must be reasonably designed to force

---

[7] Rec. Doc. 79.

[8] Trial Exhibit D. Paragraph E states:

IT IS HEREBY ORDERED that the Debtor shall timely perform all post-petition obligations under the Leases, including, without limitation, (i) timely payment of post-petition rent in accordance with the Leases, (ii) timely payment of post-petition amounts due to GE Engine Services, LLC or other appropriate General Electric Aviation affiliate ("GE") under the GE Engine Care Maintenance Plan (EMCP") Program Engine Services Agreement ("EMCP Angreement") covering the engines attached to the Aircraft (collectively "Engines"), (iii) continuing coverage of the Engines in the GE EMCP Program (subject to Paragraph (I) below), (iv) timely payment of post-petition Maintenance Reserves in accordance with the Leases, (v) timely payment of all post-petition fees, costs and taxes owed in connection with continuing possession, use and operation of the Aircraft, including, without limitation, license and registration fees, and costs of fuel, service and parts for the Aircraft, (vi) timely maintenance of the Aircraft in good operating condition and in accordance with the post-petition requirements (including unsatisfied pre-petition requirements) contained in the Approved Maintenance Program (as such term is defined in the Leases), (vii) insuring the Aircraft in accordance with the terms of the Leases, and (viii) timely payment of any and all amounts required to remove, release or avoid the imposition of any post-petition Liens (as such term is defined in the Leases) on the Aircraft. Items (i), (ii), (iii), (iv), and (vii) in this paragraph shall constitute "Non Curable Defaults."

[9] *In the Matter of Terrebone Fuel & Lube, Inc.* 108 F.3d 609, 611 (5th Cir. 1997).

compliance, without being punitive.[10] The Fifth Circuit has held that "such sanctions should be adapted to the particular circumstances of each case, and that the only limitation upon the sanctions imposed is that they be remedial or coercive but not penal."[11] Additionally, "the [trial] court has broad discretion in the assessment of damages in a civil contempt proceeding."[12]

Alandia argues that Fayard should be held personally liable for compensatory damages in the amount of $2,071,366.11 plus the cost of a propeller for one of the planes, and it calculates the damages by adding together all of the amounts that would have been paid by FlyGLO under the consent order, had FlyGLO been able to fulfill all of its obligations under the order.

Before delving into the specifics of the court's ruling on the motion for contempt, the court notes the difference between FlyGLO's inability to fulfill the terms of the consent order due to its failure to successfully reorganize (i.e., to make payments on amounts due to various entities and to fund maintenance and repairs required by the consent agreement), and FlyGLO's (acting through Fayard) failure to act reasonably to prevent Alandia from incurring unnecessary expense and difficulty in retrieving its aircraft once it was obvious that FlyGLO would not be able to reorganize.

---

[10] *In re Dinnan*, 625 F.2d 1146, 1149 (5th Cir. 1980) *citing U.S. v. United Mine Workers,* 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947).

[11] *Florida Steel Corp. V. NLRB,* 648 F.2d 233, 239 (5th Cir. Unit B. 1981).

[12] *American Airlines Inc. v. Allied Pilots Ass'n,* 228 F.3d 574, 585 (5th Cir. 2000).

A majority of the expenses that Alandia argues should be compensatory damages for Fayard's failure to abide by the consent order are more properly characterized as rejection damages and/or a pre-petition claim that may or may not constitute an administrative claim against the debtor's estate. This includes payments that should have been made to the GE EMCP Program, costs to reinstate the engines into the GE EMCP Program, as well as maintenance and inspection costs. The court may need to determine the damages Alandia suffered with respect to these items at a later date, but as stated above, the parties agreed to defer these questions to a later date so that the newly appointed Chapter 7 trustee would have an opportunity to review the matter.[13]

The court declines to award as contempt against Fayard personally, any damages relating to maintenance and repairs that should have been performed and paid for by FlyGLO in the ordinary course of its business. In contrast, the court finds that once FlyGLO determined that its reorganization plans were not feasible, and it informed Alandia that it would be rejecting the aircraft leases, Fayard engaged in a course of conduct that made it difficult for Alandia to obtain the paperwork and information it needed so that it could collect its planes and begin doing what needed to be done so that Alandia could find another lessor for its planes. This is where the court finds contempt is warranted.

Usually it would be FlyGLO, the debtor, that would be the entity held in contempt for

---

[13] The Chapter 11 was converted to a Chapter 7 on September 1, 2017, and David V. Adler was appointed as the Chapter 7 Trustee on September 5, 2017. This hearing was held on September 14, 2017.

failure to abide by the consent order. Alandia asks the court to take the extraordinary step of finding Fayard, the CEO of FLyGLO, personally liable. Thus, the question before the court is whether Fayard should be held personally liable for any of the damages Alandia incurred because of his behavior in delaying the return of the aircraft in accordance with the lease requirements and the consent order. Alandia cites *Wilson v. U.S.*, 221 U.S. 361 (1911) and its progeny for the proposition that a federal court may hold an officer in contempt where his acts or omissions result in an entity's failure to comply with a court order. The court accepts this line of reasoning because a corporate entity can only act through its officers. In a closely held company such as the debtor, which was managed, operated and controlled by Fayard, it is not unreasonable to look to Fayard when his conduct causes the debtor to fail to comply with a court order.

At the evidentiary hearing on this motion, three witnesses testified. Gustafsson, the CEO of Alandia, Fayard, and Douglas Draper, the Chapter 11 counsel for the debtor. The court found Gustafsson to be a truthful and direct witness. In contrast, the testimony of Fayard was not all that the court expected. Although the court does not find that Fayard lied on the stand, he was very evasive, and often claimed not to have knowledge of several things that the CEO of a corporation should have known. His attempts to avoid personal responsibility for several things that only he could be held responsible for were not very convincing. The court's impression of Draper was that he was a truthful and credible witness but that his testimony was insufficient to excuse Fayard's failure to act responsibly.

Over the course of this case, the court has received an education as to the

requirements for maintenance and paperwork on leased aircraft, which are extensive and expensive. The primary concern of Alandia from the outset of the case (other than getting paid, which is a concern all creditors share) has been that the paperwork that must accompany an aircraft be in order, and that the enrollment in the GE engine maintenance program not be disrupted. Fayard was certainly aware of these concerns from the outset and through the negotiation of the consent order. Communications were introduced into evidence clearly showing Gustaffson relayed his concerns to Fayard. Alandia's counsel also sent communications to debtor's counsel attempting to address the lack of cooperation and response from Fayard.[14] In a hearing before the court on the debtor's motion to reject the first aircraft lease, held on July 19, 2017, at which Fayard did not appear, the court admonished the debtor's counsel for Fayard's absence and instructed counsel to convey to Fayard that the court expected his cooperation so that Alandia could recover its planes as quickly as possible.

    The main bone of contention that Alandia has is that once the leases were rejected, Alandia had an inordinate amount of difficulty in obtaining the necessary information and paperwork that were vital to the reclamation of the aircraft. Alandia is in the business of leasing airplanes, so the inability to secure the planes, and recover them so that they could be leased to a new client created a significant problem. It is because of this inaction that the

---

[14] Exhibits G-M, W, X and Fayard 3 introduced into evidence at the hearing held September 14, 2017, and the testimony of Gustafsson, all of which showed that Alandia expressed quite clearly to Fayard its need for assistance in recovering the paperwork and information needed to take possession of its planes, and that Fayard was, for the most part, unresponsive.

court finds Fayard personally liable for contempt.

Had Fayard made an honest effort to respond to Alandia's inquiries as to the whereabouts of the engine and propellor, and been more forthcoming with the information about the dispute with GE over the charges for the maintaining the engines in the maintenance program, much of the post-rejection problems Alandia encountered in retaking possession of its aircraft could have been avoided. It is no answer to claim, as Fayard did, that CFM was responsible for plane maintenance. The testimony and evidence presented at trial showed that after informing Alandia of the lease rejection, Fayard was not responsive to Alandia's requests for information about where the paperwork for the planes was, whether the plane engines were properly maintained up to date in the GE certification program, and where a missing engine and propeller were located. All of Gustafsson's contacts and dealings were with Fayard, and as far as Gustafsson and Alandia were concerned, Fayard was their only hope for a prompt return of the aircraft. Thus, the court does find contempt against Fayard personally because of his inaction and failure to reasonably respond to Alandia following the rejection of the first aircraft on June 30, 2017, and thereafter. The measure of the damages for the failure to act shall be the loss of rental income Alandia suffered because it could not immediately take possession of its planes.

Gustafsson testified that for the lease rejected on June 30, 2017, he was able to recover the plane on August 7 or 8, which means there was an inactive period of 39 days.[15]

---

[15] Trial transcript dated 9/14/17 at p. 47.

He also testified that the other two planes were recovered two weeks later, or August 21.[16] Those planes' leases were rejected via email as of July 15, so that means there was an interval of 38 days delay in Alandia's ability to recover the other two planes. The three planes leased for $28,000 each per month, or $920.55 per day, so the total damages are calculated to be $105,863.25.[17]

The court finds that the additional amounts requested by Alandia are not reasonably related to the damages it suffered from Fayard's failure to cooperate with Alandia post-rejection. Rather, those amounts are claims Alandia has against the debtor's estate, which, as previously stated, are reserved to the Chapter 7 Trustee to allow or defend against at a later date.

### III. Conclusion

Because the court finds that Fayard did not act reasonably immediately post-rejection to return Alandia's airplanes in a prompt manner with a minimum of inconvenience and cost

---

[16] *Id.*

[17] The court has calculated this as follows:

Yearly rental per plane is $28,000 x 12 = $336,000
Daily rental per plane is $336,000 / 365 = $920.55

Cost for period when plane 1 was unavailable for 39 days $920.55 x 39 = $35,901.45

Cost per plane for period when planes 2 and 3 were unavailable for 38 days $920.55 x 38 = $34,980.90 for each plane

Total cost for the time all three planes were unavailable $35,901.45 + $34,980.90 + $34,980.90 = $105,863.25

to Alandia, the court grants in part Alandia's motion for contempt against Fayard personally to compensate Alandia for the damages it suffered as a direct result of the complained of behavior. The court also finds, however, that much of Alandia's requested damages of $2,071,366.11 include many items that are not properly tailored to have a deterrent effect or to compensate Alandia for Fayard's unresponsive behavior, which is, after all, the point of a finding of contempt by the court. Fayard has 21 days from the date of this order to pay the damages, or interest will begin to run at the federal judicial rate.

New Orleans, Louisiana, April 12, 2018.

*J. A. Brown*
Jerry A. Brown
U.S. Bankruptcy Judge